LAW OFFICE OF WILLIAM J. HEALY
WILLIAM J. HEALY, #146158
748 Holbrook Pl.
Sunnyvale, CA 94087
Telephone: (408) 373-4680

ATTORNEYS FOR
JULIA DURWARD, individually and
as a member of Ginger Mountain Lodge LLC

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

### (San Jose Division)

| | |
|---|---|
| In re:<br><br>EDDIE PASCUA BATOON and<br>FLORA LLANES BATOON,<br><br>        Debtors. | Case No. 23-50592<br><br>CHAPTER 7<br><br>**REQUEST FOR JUDICIAL NOTICE**<br><br>Hearing Date:    October 31, 2023<br>Hearing Time:    1:30 p.m.<br>Hearing Location:<br>   Courtroom 9<br>   Via Video/Teleconference<br>Hon. Stephen L. Johnson |
|   | **Adversary Proceeding No.** 23-05022 |
| EDDIE PASCUA BATOON and<br>FLORA LLANES BATOON,<br><br>        Plaintiffs,<br><br>        v.<br><br>JULIA DURWARD, as an individual and<br>Member of Ginger Mountain Lodge LLC,<br>and DOES 1 TO 10,<br><br>        Defendants. | |

COME NOW, JULIA DURWARD, individually and as a member of Ginger Mountain

Lodge LLC ("Durward" or "Movant"), and submits this Request For Judicial Notice in support

of her motion to dismiss the Complaint (Doc#1) pursuant to Federal Rules of Civil Procedure 12 (b)(1) or alternatively compel alternative dispute resolution and stay action, to dismiss for improper venue pursuant to FRCP 12 (b)(3), or dismiss for failure to state a cause of action pursuant to FRCP 12 9b)(6) ("Motion")[1] as follows.

## I.  Legal Authority.

A bankruptcy court may take judicial notice of its own records, as well as the records of other courts in related matters. (Fed.Rules.Evid. 201[2]; *In re Meltzer*, 516 B.R. 504, 506 n.2 (Bankr. N.D. Ill. 2014); *SG & Co. Northeast, LLC v. Good*, 461 B.R. 532, 535 n.3 (Bankr. N.D. Ill. 2011)).

On a motion to dismiss the court may take judicial notice of facts outside the pleadings (*Mack v. South Bay Beer Distribs*, 798 F.2d 1279, 1282 (9th Cir. 1986)).

## II.  Request For Judicial Notice.

Exhibit A. A copy of the Operating Agreement of Ginger Mountain[3], specifically that Article V Management and Control of the Company, subsection 5.3 (e) provides:

> "The Members recognize that, given initial makeup of the membership interests, the possibility of a deadlock may exits. Therefore, the Members agree that for so long as the membership interests are such that a deadlock could arise, if a majority of the Members cannot agree upon a material issue affecting ownership, management, or operation of the business of the Company, they will submit the matter for review to a neutral and mutually acceptable "tie breaker" who is familiar with the Company's business. The decision of such tie breaker shall be final and binding on the members and become the decision of the Company. If the Members are unable to agree upon a tie breaker, the deadlock will be resolved by binding mediation through JAMS or some other mutually agreed upon mediation forum as mutually agreed-upon by the Members."

Dated: August 28, 2023                    LAW OFFICE OF WILLIAM J. HEALY
                                          */s/ William J. Healy*
                                          William J. Healy

---

[1] "Fed.Rules.Civ.Proc.", of "Fed.R.Civ." or "FRCP" means the Federal Rules of Civil Procedure.

[2] "Fed.Rules.Evid." or "FRE" means Federal Rules of Evidence.

[3] A copy of an Operating Agreement is referenced in and attached to the Notice of Removal in another Adversary Proceeding before this court, Case No. 23-05016, Doc#1, page 72-93).

# EXHIBIT A

EXHIBIT 1

# GINGER MOUNTAIN LODGE, LLC

## A California
## Limited Liability Company
## Operating Agreement

# GINGER MOUNTAIN LODGE, LLC

## A California Limited Liability Company

This Operating Agreement (this "Agreement") is entered into effective May __, 2015, by and among Eddie Batoon, Flora Batoon, Robert Durward, and Julia C. Durward (each individually referred to as a "Member" and collectively as "Members").

The parties have agreed to organize a limited liability company in accordance with the terms and subject to the conditions set forth in this Agreement.

NOW, THEREFORE, the parties agree as follows:

## Article I
### Defined Terms

The following capitalized terms shall have the respective meanings specified in this Article I. Capitalized terms not defined in this Agreement, (including *Exhibit* B), shall have the meaning specified in the Act.

*"Act"* means the California Limited Liability Company Act, as amended from time to time.

*"Affiliate"* means (a) a Person directly or indirectly controlling, controlled by, or under common control with another Person; (b) a Person owning or controlling ten percent (10%) or more of the outstanding voting securities or beneficial interests of another Person; (c) an officer, director, partner, or member of the immediate family of an officer, director or partner, of another Person; and/or (d) any affiliate of any such Person.

*"Agreement"* means this Operating Agreement, as amended from time to time, including each exhibit hereto.

*"Assignee"* means the Person who has acquired an Economic Interest in the Company but is not a Member.

*"Cash Flow"* means all cash derived from operations of the Company (including interest received on reserves), without reduction for any noncash charges, but less cash used to pay current operating expenses and to pay or establish reasonable reserves for future expenses, debt payments, capital improvements, and replacements as determined by the Members.

*"Company"* means the limited liability company formed in accordance with this Agreement.

*"Contribution"* means any money, property, or services rendered, or a promissory note or other binding obligation to contribute money or property, or to render services as permitted in this Agreement or by law, which a Member contributes to the Company as capital in that

2

Member's capacity as a Member pursuant to this Agreement or any other agreement between the Members, including an agreement as to value.

"*Economic Interest*" means a Person's right to share in the income, gains, losses, deductions, credit, or similar items of, and to receive Distributions from, the Company, but does not include any other rights of a Member including, without limitation, the right to Vote or to participate in management, or any right to information concerning the business and affairs of the Company.

"*Initial Contribution*" means the amount listed in *Exhibit* A under Initial Capital Contribution.

"*Interest Holder*" means any Person who holds an Economic Interest, whether as a Member or as an Assignee of a Member.

"*Involuntary Withdrawal*" means, with respect to any Member, the affirmative Vote of Members, excluding the Member whose withdrawal is being Voted upon, holding not less than seventy-five percent 75% of the Membership Interests to terminate such Member's Membership Interest.

"*Member*" means any person who executes a counterpart of this Agreement as a Member and any Person who subsequently is admitted as a Member of the Company.

"*Membership Interest*" means a Member's rights in the Company, collectively, including the Member's Economic Interest, any right to Vote or participate in management, and any right to information concerning the business and affairs of the Company.

"*Percentage*" means, as to a Member, the Percentage set forth after the Member's name on *Exhibit* A, as amended from time to time, and as to an Interest Holder who is not a Member, the Percentage or part of a Percentage that corresponds to the portion of a Member's Economic Interest that the Interest Holder has acquired, to the extent the Interest Holder has succeeded to a Member's interest.

"*Person*" means and includes an individual, corporation, partnership, association, limited liability company, trust, estate, or other entity.

"*Secretary of State*" means the Secretary of State of the State of California.

"*Transfer*" means, when used as a noun, any sale, hypothecation, pledge, assignment, attachment, or other transfer, and, when used as a verb, to sell, hypothecate, pledge, assign, or otherwise transfer.

"*Voluntary Withdrawal*" means a Member's disassociation from the Company by means other than a Transfer or an Involuntary Withdrawal.

3

## Article II
## Formation and Name; Office; Purpose; Term

2.1.    *Organization.* The parties hereby organize a limited liability company pursuant to the Act and the provisions of this Agreement. The Company has caused Articles of Organization to be prepared, executed, and filed with the Secretary of State.

2.2.    *Name of the Company.* The name of the Company is GINGER MOUNTAIN LODGE, LLC.

2.3.    *Purpose.* The Company is organized to engage in any lawful act or activity for which a limited liability company may be organized under the Beverly-Killea Limited Liability Company Act, including but not limited to purchase, lease, operate, develop, and sell real estate property, and to do any and all things necessary, convenient, or incidental to that purpose.

2.4.    *Term.* The Company shall continue in existence perpetually, unless sooner dissolved as provided by this Agreement or required by the Act.

2.5.    *Principal Place of Business.* The Company's Principal Place of Business shall be located at 2644 Lake Tahoe Blvd., South Lake Tahoe, CA 96150, or at any other place within the State of California upon which the Members agree.

2.6.    *Resident Agent.* The name and address of the Company's resident agent in the State of California is Julia C. Durward, 1681 Shortridge Avenue, San Jose, CA 95116.

2.7.    *Members.* The name, present mailing address, taxpayer identification number, initial Contribution and Percentage of each Member are set forth on *Exhibit* A.

2.8.    *Tax Treatment as a Partnership.* The Members intend that the company be treated as a partnership under Regulation Section 301.7701-3 and analogous provisions of state tax laws, and the Company shall not elect to be treated as an association taxable as a corporation.

## Article III
## Members; Capital; Capital Accounts

3.1.    *Initial Contributions.* Upon the execution of this Agreement, the Members shall contribute to the Company cash in the amounts respectively set forth on *Exhibit* A.

3.2.    *No Additional Contributions.* No Member shall be required to contribute any additional capital to the Company, and no Member shall have personal liability for any obligation of the Company except as expressly provided by law.

4

3.3.    *No Interest on Contributions.* Neither Members nor any Interest Holders shall be paid interest with respect to Contributions.

3.4.    *Return of Contributions.* Except as otherwise provided in this Agreement, no Member nor Interest Holder shall have the right to receive the return of any Contribution or withdraw from the Company, except upon the dissolution of the Company.

3.5.    *Form of Return of Capital.* If a Member or an Interest Holder is entitled to receive the return of a Contribution, the Company may distribute to such person, in lieu of money, notes, or other, property having a value equal to the amount of money distributable to the Member or Interest Holder.

3.6.    *Capital Accounts.* A separate Capital Account shall be maintained for each Member and Interest Holder.

3.7.    *Loans and Other Business Transactions.* Any Member may, at any time, make or cause a loan to be made to the Company in any amount and on those terms upon which the Company and the Member agree. Members may also transact other business with the Company and, in doing so, they shall have the same rights and be subject to the same obligations arising out of any such business transaction as would be enjoyed by and imposed upon any Person, not a Member, engaged in a similar business transaction with the Company.

3.8.    Except as required under the Act or as expressly set forth in this Agreement, no Member will be personally liable for any debt, obligation, or liability of the Company, whether that liability or obligation arises in contract, tort or otherwise.

## Article IV
## Profit, Loss, and Distributions

4.1.    *Distribution of Cash Flow.* Except as provided in Section 4.3, Cash Flow for each taxable year of the Company shall be distributed to the Interest Holders in proportion to their Percentages no later than seventy-five (75) days after the end of the taxable year.

4.2.    *Allocation of Profit or Loss.* After giving effect to the special allocations set forth in *Exhibit* B, for any taxable year of the Company, Profit and Loss shall be allocated to the Interest Holders in proportion to their Percentages.

4.3.    *Liquidation and Dissolution.*

(a)    Upon liquidation of the Company, the assets of the Company shall be distributed to the Interest Holders in accordance with their positive balances in their respective Capital Accounts, after giving effect to all Contributions, Distributions, and allocations for all periods. Distributions to the Interest Holders pursuant to this *Section* 4.3(a) shall be made in accordance with Regulation Section 1.704-1(b)(2)(ii)(b)(2).

5

(b)     No Interest Holder shall be obligated to restore a Negative Capital Account.

## Article V
## MANAGEMENT AND CONTROL OF THE COMPANY

5.1.     *Management.* The Company shall be managed by the Members. Except as specifically provided otherwise in this Agreement, each Member shall have the right to act for and bind the Company in the ordinary course of its business.

5.2.     *Meetings of and Voting by Members.*

(a)     A meeting of the Members may be called at any time by any Member. Meetings of Members shall be held at the Company's principal place of business or at any other place whether in California or elsewhere, designated by the Person or Persons calling the meeting. Not less than ten (10) nor more than sixty (60) days before each meeting, the Person or Persons calling the meeting shall give written notice of the meeting to each Member entitled to Vote at the meeting. The notice shall state the time, place, and purpose of the meeting. Notwithstanding the foregoing provisions, each Member who is entitled to notice may waive notice, either before or after the meeting, by executing a waiver of such notice, or by appearing at and participating, in person or by proxy, in the meeting. Unless this Agreement provides otherwise, at a meeting of Members, the presence in person or by Proxy of Members holding Percentages which aggregate not less than fifty-one percent (51%), constitutes a quorum. A Member may Vote either in person or by written Proxy signed by the Member or by the Member's duly authorized agent.

(b)     Except as otherwise provided in this Agreement, the affirmative Vote of Members holding a majority of the aggregate Percentages present at the meeting in person and by proxy shall be required to approve any matter coming before the Members.

(c)     In lieu of holding a meeting, the Members may take action by written consents specifying the action to be taken, which consents must be executed and delivered to the Company by Members whose combined Voting Power constitutes not less than 51% of the total Voting Power of all Members. Any such approved action shall be effective immediately. The Company shall give prompt notice to all Members of any action approved by Members by less than unanimous consent.

(d)     The following matters shall require the Vote or consent of the percentage interest of Members indicated after each such item for such action to be approved by the Members:

(1)     a decision to continue the business of the Company after dissolution of the Company (51%);

(2)     approval of the transfer of a Membership Interest and admission of an Assignee as a Member (51%). Any such consent to transfer or admission may be unreasonably withheld in the sole and absolute discretion of the consenting party;

6

(3)   an amendment to the Articles of Organization or this Agreement (51%).

(e)   The Members recognize that, given the initial makeup of the membership interests, the possibility of a deadlock may exist. Therefore, the Members agree that for so long as the membership interests are such that a deadlock could arise, if a majority of the Members cannot agree upon a material issue affecting ownership, management, or operation of the business of the Company, they will submit the matter for review to a neutral and mutually acceptable "tie breaker" who is familiar with the Company's business. The decision of such tie breaker will be binding. The tie breaker shall be an individual person. The decision of the tie breaker shall be final and binding on the Members and become the decision of the Company. If the Members are unable to agree upon a tie breaker, the deadlock shall be resolved by binding mediation through JAMS or such other mediation forum as mutually agreed-upon by the Members.

5.3.   *Personal Service.* No Member shall be required to perform services for the Company solely by virtue of being a Member. Unless approved by the Members, no Member shall be entitled to compensation for services performed for the Company after the effective date of this Agreement. However, upon substantiation of the amount and purpose thereof, the Members shall be entitled to reimbursement for expenses reasonably incurred, and advances of funds reasonable made, in furtherance of the business of the Company.

5.4.   *Duties of Parties.*

(a)   Each Member shall devote such time to the business and affairs of the Company as is necessary to carry out the Member's duties set forth in this Agreement.

(b)   Except as otherwise expressly provided in *Section* 5.4(e), nothing in this Agreement shall be deemed to restrict in any way the rights of any Member, or of any Affiliate of any Member, to conduct any other business or activity whatsoever, and no Member shall be accountable to the Company or to any other Member with respect to that business or activity, even if the business or activity competes with the Company's business. The organization of the Company shall be without prejudice to the Members' respective rights (or the rights of their respective Affiliates) to maintain, expand, or diversify such other interests and activities and to receive and enjoy profits or compensation therefrom. Each Member waives any rights the Member might otherwise have to share or participate in such other interests or activities of any other Member or the Member's Affiliates.

(e)   The only fiduciary duties a Member owes to the Company and the other Members are the duty of loyalty and the duty of care set forth in subdivisions (1) and (2):

(1)   a Member's duty of loyalty to the Company and the other Members is limited to the following:

7

(A)    to account to the Company and hold as trustee for it any property, profit, or benefit derived by the Member in the conduct or winding up of the Company's business or derived from a use by the Member of Company property, including the appropriation of a Company opportunity, without the consent of the other Members;

(B)    to refrain from dealing with the Company in the conduct or winding up of the Company business as or on behalf of a party having an interest adverse to the Company without the consent of the other Members; and

(C)    to refrain from competing with the Company in the conduct of the Company business before the dissolution of the Company without the consent of the other Members.

(2)    a Member's duty of care to the Company and the other Members in the conduct and winding up of the Company business is limited to refraining from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law.

5.5.    *Indemnification of Members.*

(a)    A Member shall not be liable, responsible, or accountable, in damages or otherwise, to any other Member or to the Company for any act performed by the Member with respect to Company matters, and within the standard of care specified in *Section* 5.4(c)(2).

(b)    The Company shall indemnify each Member for any act performed by the Member with respect to Company matters, unless such act constitutes grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law.

## Article VI
## Transfer of Interests and Withdrawals of Members

6.1.    *Transfers.* Except as herein provided, no Member may Transfer all, or any portion of, or any interest or rights in, the Membership Interest owned by the Member. Each Member hereby acknowledges the reasonableness of this prohibition in view of the purposes of the Company and the relationship of the Members. The attempted Transfer of any portion or all of a Membership Interest in violation of the prohibition contained in this *Section* 6.1 shall be deemed invalid, null and void, and of no force or effect, except any Transfer mandated by operation of law, and then only to the extent necessary to give effect to such Transfer by operation of law.

(a)    A Member may Transfer all or any portion of or any interest or rights in the Member's Membership Interest if each of the following conditions ("Conditions of Transfer") is satisfied:

(1)    the Transfer may be accomplished without registration, or similar process, under federal and state securities laws;

8

(2)     the transferee delivers to the Company a written agreement to be bound by the terms of Article VI;

(3)     the Transfer will not result in the termination of the Company pursuant to IRC Section 708;

(4)     the Transfer will not result in the Company being subject to the Investment Company Act of 1940, as amended, or the Company being treated as a publicly traded partnership under IRC Section 7704;

(5)     the transferor or the transferee delivers the following information to the Company: (i) the transferee's taxpayer identification number; and (ii) the transferee's initial tax basis in the transferred Membership Interest; and

(6)     the transferor complies with the provisions set forth in *Section* 6.1(c).

(b)     If the Conditions of Transfer are satisfied, the Member may Transfer all or any portion of the Member's Membership Interest. The Transfer of an Economic Interest pursuant to this *Section* 6.1 shall not result in the transfer of any of the transferor's other Membership rights. The transferee of the Economic Interest shall be an Assignee and shall have no right to: (i) become a Member; (ii) exercise any Membership rights other than those specifically pertaining to the ownership of an Economic Interest; or (iii) act as an agent of the Company. The Assignee shall become a member only if the requirements of *Section* 5.2(d)(2) are met.

(c)     *Right of First Offer.*

(1)     if a Member (a "Transferor") desires to Transfer all or any portion of, or any interest or rights in the Transferor's Membership Interest (the "Transferor Interest"), the Transferor shall notify the Company of that desire (the "Transfer Notice"). The Transfer Notice shall describe the Transferor Interest. The Company, or its nominee(s), shall have the option (the "Purchase Option") to purchase all of the Transferor Interest for a price (the "Purchase Price") equal to the Appraised Value of said Transferor Interest.

(2)     the Purchase Option shall be and remain irrevocable for a period (the "Transfer Period") ending at 11:59 P.M. local time at the Company's principal office on the thirtieth (30th) day following the day the Transfer Notice is given to the Company.

(3)     at any time during the Transfer Period, the Company and/or its nominee (the "Purchaser(s)") may elect to exercise the Purchase Option by giving written notice of its election to the Transferor. The Transferor shall not be deemed a Member for the purpose of Voting on whether the Company shall elect to exercise the Purchase Option.

(4)     the Purchaser's notice of its election to purchase the Transfer Interest shall fix a closing date (the "Transfer Closing Date") for the purchase, which shall not be

9

earlier than five (5) days after the date of the notice of election nor more than thirty (30) days after the expiration of the Transfer Period.

(5) the Purchase Price shall be paid in cash on the Transfer Closing Date unless the Purchasers elect to pay the Purchase Price in installments pursuant to *Section 6.5*.

(6) if the Company's Purchase Option is not exercised, the Transferor shall be permitted to offer and sell the Transferor Interest to any other person for a period of three (3) months (the "Free Transfer Period") after the expiration of the Transfer Period. If the Transferor does not Transfer the Transferor Interest within the Free Transfer Period, the Transferor's right to Transfer the Transferor Interest pursuant to this Section shall cease and terminate.

(7) any Transfer of the Transferor Interest made after the last day of the Free Transfer Period or without strict compliance with the terms, provisions, and conditions of this Section and all other terms, provisions, and conditions of this Agreement, shall be null and void and of no force or effect.

6.2. *Voluntary Withdrawal.*

(a) No Member shall have the right or power to effect a Voluntary Withdrawal from the Company, except upon the affirmative Vote of Members holding a majority of the aggregate Percentages.

(b) Upon withdrawal of any Member, as permitted under the terms of this *Section 6.2*, the withdrawn Member and the Company shall have the respective rights and obligations set forth in *Section 6.3*, provided, however, that the Withdrawn Member's Membership Interest shall be valued at Book Value, and, provided further, that the Company shall have the right to pay the amount due the Withdrawing Member in installments pursuant to *Section 6.5*.

6.3. *Involuntary Withdrawal.* Immediately upon the occurrence of an Involuntary Withdrawal, the successor of the withdrawn Member shall thereupon become an Interest Holder, but shall not become a Member.

6.4. *Appraised Value.*

(a) The term "Appraised Value" means the appraised value of the Company as hereinafter provided. Within fifteen (15) days after the Transfer Notice, the Company and the Transferor shall each appoint an appraiser to determine the value of the Company. If the two appraisers agree upon such value, they shall jointly render a single written report stating that value. If the two appraisers cannot agree upon the value of the Company, they shall each render a separate written report and shall appoint a third appraiser, who shall appraise the Company, determine its value, and render a written report of such appraiser's opinion thereon. Each party shall pay the fees and other costs of the appraiser appointed by such party, and the fees and other costs of the third appraiser shall be shared equally by both parties.

10

(b)    The value contained in the aforesaid joint written report or written report of the third appraiser, as the case may be, shall be the Appraised Value; provided, however, that if the value of the equity contained in the appraisal report of the third appraiser is more than the higher of the first two appraisals, the higher of the first two appraisals shall govern; and provided further, that if the value of the equity contained in the appraisal report of the third appraiser is less than the lower of the first two appraisals, the lower of the first two appraisals shall govern.

6.5.    *Installment Payments*.  If the Company or its nominee, as the case may be (the "Purchaser"), elects to pay the Purchase Price on an installment basis (the "Indebtedness"), such payments shall be structured as follows:  an upfront payment in cash or immediately available funds equal to twenty percent of the Purchase Price, and the balance payable in equal monthly installments of principal and interest (wherein said interest shall be equal to the Applicable Federal Rate in effect at the time) over a period that shall expire no later than five (5) years from the Transfer Closing Date, and the Purchaser shall evidence the obligation to pay the Indebtedness by executing and delivering a promissory note to the Transferor.

## Article VII
### Dissolution, Liquidation, and Termination of the Company

7.1.    Events of Dissolution. The Company shall be dissolved upon the happening of any of the following events:

(a)    Upon the unanimous written agreement of the Members; or

(b)    Upon a judicial order or decree of dissolution.

7.2.    *No Dissolution upon Withdrawal of Member*. The Company shall not dissolve upon the Voluntary or Involuntary Withdrawal of any Member.

7.3.    *Procedure for Winding Up and Dissolution*. If the Company is dissolved, the remaining Members shall wind up its affairs. On winding up of the Company, the assets of the Company shall be distributed, first to creditors of the Company, including Interest Holders who are creditors, in satisfaction of the liabilities of the Company, and then to the Interest Holders, in accordance with *Section 4.3*.

7.4.    *Filing of Certificate of Cancellation*. Upon completion of winding up the affairs of the Company. the Members shall promptly file a Certificate of Cancellation of Articles of Organization with the Secretary of State. If there are no remaining Members, such Certificate shall be filed by the last Person to be a Member; if there are no remaining Members, or last Person to be a Member, the Certificate shall be filed by the legal or personal representatives of the last Person to be a Member. No Manager or Member shall be entitled to any compensation for services provided in winding up the Company.

11

## Article VIII
### Books, Records, Accounting, and Tax Elections

8.1.   *Bank Accounts.* All funds of the Company shall be deposited in a bank account or accounts opened in the Company's name. The Members shall determine the financial institution or institutions at which the accounts will be opened and maintained, the types of accounts, and the Persons who will have authority with respect to the accounts and the funds therein.

8.2.   *Maintenance of Books and Records.*

(a)   The Members shall keep or cause to be kept complete and accurate books, records, and financial statements of the Company and supporting documentation of transactions with respect to the conduct of the Company's business. The books, records, and financial statements of the Company shall be maintained on the [accrual basis in accordance with generally accepted accounting principles] [cash method of accounting]. Such books, records, financial statements, and documents shall include, but not be limited to, the following:

(1)   a current list of the full name and last known business or residence address of each Member and Interest Holder, in alphabetical order, with the Contribution and the share in profits and losses of each Member and Interest Holder specified in such list;

(2)   the Articles of Organization, including all amendments; and any powers-of-attorney under which the Articles of Organization or amendments were executed;

(3)   federal, state, and local income tax or information returns and reports, if any, for the six most recent taxable years;

(4)   this Agreement and any amendments, and any powers-of-attorney under which this Agreement or amendments were executed;

(5)   financial statements for the six most recent years; and

(6)   internal books and records for the current and four most recent years

(b)   Such books, records, and financial statements of the Company and supporting documentation shall be kept, maintained, and available at the Company's office within the State of California.

8.3.   *Right to Inspect Books and Records; Receive Information.*

(a)   Upon the reasonable request of a Member or Interest Holder, for a purpose reasonably related to the interest of that Member or Interest Holder, the Company shall promptly deliver to the requesting Member, at the expense of the Company, a copy of this Agreement, as

12

well as the information required to be maintained by the Company under paragraphs (1) and (3) of *Section* 8.2(a).

(b)     Each Member and Interest Holder has the right upon reasonable request, and for purposes reasonably related to the interest of that Person as a Member or Interest Holder, to do the following:

(1)     to inspect and copy, during normal business hours, any of the records required to be maintained by the Company under *Section* 8.2(a); and

(2)     to obtain from the Company promptly after becoming available, a copy of the Company's federal, state, and local income tax or information returns for each year.

(c)     If the Company has more than thirty-five (35) Members, Members representing at least five percent (5%) of the Voting interests of all Members, or three or more Members, may make a written request to the Member responsible for maintaining the financial records of the Company for an income statement of the Company for the initial three-month, six-month, or nine-month period of the current fiscal year ended more than thirty (30) days prior to the date of the request, and a balance sheet of the Company as of the end of that period. The statement must be delivered or Mailed to the Members within thirty (30) days thereafter. The financial statements referred to in this Section shall be accompanied by the report thereon, if any, of the independent accountants engaged by the Company or, if there is no report, the certificate of the Member upon whom the request was made that the financial statements were prepared without audit from the books and records of the Company.

(d)     If the Company has more than thirty-five (35) Members, the Company shall cause an annual report to be sent to each Member not later than one hundred twenty (120) days after the close of the Company's fiscal year. Such report must contain the Company's balance sheet as of the end of the Company's fiscal year and an income statement and statement of changes in financial position for such fiscal year. The financial statements referred to in this Section shall be accompanied by the report thereon, if any, of the independent accountants engaged by the Company or, if there is no report, the certificate of the Member responsible for maintaining the financial records of the Company that the financial statements were prepared without audit from the books and records of the Company.

(e)     The Company shall send or shall cause to be sent to each Member and Interest Holder within ninety (90) days after the end of each fiscal year of the Company: (i) such information as is necessary to complete federal and state income tax or information returns, and (ii) if the Company has thirty-five (35) or fewer Members, a copy of the Company's federal, state, and local income tax or information returns for the fiscal year.

(f)     Unless otherwise expressly provided in this Agreement, the inspecting or requesting Member or Interest Holder, as the case may be, shall reimburse the Company for all reasonable costs and expenses incurred by the Company in connection with such inspection and copying of the Company's books and records and the production and delivery of any other books or records.

13

8.4.   *Annual Accounting Period.* The annual accounting period of the Company shall be its taxable year. The Company's taxable year shall be selected by the Members, subject to the requirements and limitations of the Code.

8.5.   *Tax Matters Partner.* Jim Nicholas shall be the "Tax Matters Partner" for the purposes of IRC Section 6231.

## Article IX
## General Provisions

9.1.   *Assurances.* Each Member shall execute all certificates and other documents and shall do all such filing, recording, publishing, and other acts as the Members deem appropriate to comply with the requirements of law for the formation and operation of the Company and to comply with any laws, rules, and regulations relating to the acquisition, operation, or holding of the property of the Company.

9.2.   *Notifications.* Any notice, demand, consent, election, offer, approval, request, or other communication (collectively, a "notice") required or permitted under this Agreement must be in writing and delivered personally, sent by certified or registered mail, postage prepaid, return receipt requested or sent by overnight courier. A notice must be addressed to an Interest Holder at the Interest Holder's last known address on the records of the Company. A notice to the Company must be addressed to the Company's principal office. A notice delivered personally will be deemed given only when acknowledged in writing by the Person to whom it is delivered. A notice that is sent by Mail will be deemed given three (3) business days after it is Mailed. A notice that is sent by courier will be deemed given one (1) business day after it is couriered. Any party may designate, by notice to all of the others, substitute addresses or addressees for notices; and, thereafter, notices are to be directed to those substitute addresses or addressees.

9.3.   *Specific Performance.* The parties recognize that irreparable injury will result from a breach of any provision of this Agreement and that money damages will be inadequate to remedy the injury fully. Accordingly, in the event of a breach or threatened breach of one or more of the provisions of this Agreement, any party who may be injured (in addition to any other remedies which may be available to that party) shall be entitled to one or more preliminary or permanent orders (i) restraining and enjoining any act which would constitute a breach or (ii) compelling the performance of any obligation which, if not performed, would constitute a breach.

9.4   *Integration; Amendment.* This Agreement constitutes the complete and exclusive statement of the agreement among the Members. It supersedes all prior written and oral statements, including any prior representation, statement, condition, or warranty. Except as expressly provided otherwise herein, this Agreement may not be amended without the written consent of all of the Members.

9.5.   *Applicable Law.* All questions concerning the construction, validity, and interpretation of this Agreement and the performance of the obligations imposed by this

14

Agreement shall be governed by the internal law, not the law of conflicts, of the State of California.

9.6. *Headings*. The headings herein are inserted as a matter of convenience only and do not define, limit, or describe the scope of this Agreement or the intent of the provisions hereof.

9.7. *Binding Provisions*. This Agreement is binding upon, and to the limited extent specifically provided herein, inures to the benefit of, the parties hereto and their respective heirs, executors, administrators, personal and legal representatives, successors, and assigns.

9.8. *Jurisdiction and Venue*. Any suit involving any dispute or matter arising under this Agreement may only be brought in the appropriate United States District Court in California or any California State Court having jurisdiction over the subject matter of the dispute or matter. All Members hereby consent to the exercise of personal jurisdiction by any such court with respect to any such proceeding.

9.9. *Interpretation*. Common nouns and pronouns shall be deemed to refer to the masculine, feminine, neuter, singular and plural, as the identity of the Person may in the context require. References to articles, sections (or subdivisions of sections), exhibits, annexes, or schedules are to those of this Agreement, unless otherwise indicated.

9.10. *Separability of Provisions*. Each provision of this Agreement shall be considered separable; and if, for any reason, any provision or provisions herein are determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of or affect those portions of this Agreement which are valid.

9.11. *Counterparts*. This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original and all of which, when taken together, constitute one and the same document. The signature of any party to any counterpart shall be deemed a signature to, and may be appended to, any other counterpart.

9.12 *Legal Counsel; Consultation with Attorney*. The Members understand and acknowledge that Ropers Majeski Kohn & Bentley (Law Firm), has represented the Company in the preparation of this Agreement and has not represented any of the Members in the preparation of this Agreement. Each Member acknowledges and agrees as follows: (i) Law Firm is not representing the interests of such Member, and such Member is not relying on Law Firm in determining whether to enter into this Agreement; (ii) such Member has been advised to seek independent counsel, to the extent that Member deems it appropriate, to protect such Member's interests in connection with this Agreement, including, without limitation, advice as to the tax consequences of entering into this Agreement; and (iii) such Member will look solely to, and rely upon, such Member's own advisers with respect to the legal, financial and tax consequences of this investment.

9.13. *Confidential Information*. Each Member will come into possession of and/or become aware of certain proprietary matters and affairs of the Company. Members will be in a

15

position of trust and confidence as to all trade secret information and other proprietary information relating to the Company's business that is not generally known to, or readily available to, the public and that is of a confidential, proprietary or secret nature and is or may be either applicable to, or related in any way to, the present or future business of the Company or the business of any client of the Company (collectively, "Confidential Information"). Confidential Information includes, but is not limited to: opportunities, techniques and strategies; various financial and operating data consisting of, among other things, marketing data, documents, files, electronically recordable data or concepts, computer software and hardware, inventions, improvements, books, papers, compilations of information, records and specifications; names and practices of existing and potential clients; names, marketing methods, operating practices and related information regarding the Company's existing and potential clients, joint venture partners, licensees, licensors, and vendors; prices and fee structures the Company obtains or has obtained or at which it sells, has sold or intends to sell its services; information regarding the Company's financial condition; fee structures applied to and compensation paid to the Company's consultants and employees and Members. Each Member agrees not to use, publish, disseminate, misappropriate, or otherwise disclose any Confidential Information, either while the Member is a Member or thereafter, except as required in the course of that Member's pursuit of the Company's business on behalf of the Company, or as may be required by applicable law. Each Member will take all reasonable precautions to protect the confidential nature of Confidential Information and all other documents or materials entrusted to such Member containing Confidential Information. Each Member agrees that, upon the earlier of the termination of that Member's services relationship (if any) with the Company or the time that Member ceases to be a Member, that Member will return all originals and copies of the Company's property in that Member's possession, including materials, memoranda, records, reports, client lists or other documents, and specifically including any documents containing any Confidential Information. This Section 9.13 will survive termination of this Agreement.

9.14. *Representations.* Each Member represents and warrants to each other Member and the Company that such Member:

(a) Has a pre-existing personal or business relationship with the Company or one or more of its Members, or by reason of such Member's business or financial experience, or by reason of the business or financial experience of such Member's financial advisor who is unaffiliated with and who is not compensated, directly or indirectly, by the Company or any Affiliate of the Company, such Member is capable of evaluating the risks and merits of an investment in the Company and of protecting such Member's own interests in connection with this investment.

(b) Has not seen, received, been presented with, or been solicited by any leaflet, public promotional meeting, article or any other form of advertising or general solicitation as to the sale of the Company Interest.

(c) Has acquired such Member's Interest for such Member's own account, for investment, and not with a view to or for the resale, distribution, subdivision or fractionalization thereof and no other person will have any direct or indirect beneficial interest in or right to the Interest;

16

(d) Has no contract, undertaking, understanding, agreement, or arrangement, formal or informal, with any person to sell, transfer, or pledge all or any portion of such Member's Interest; and has no current plans to enter into any such contract, undertaking, understanding, agreement, or arrangement;

(e) Has sufficient financial strength to hold the Interest as an investment and bear the economic risks of that investment (including possible complete loss of such investment) for an indefinite period of time; and

(f) Has been afforded full and complete access to the books, financial statements, records, contracts, documents and other information concerning the Company and its proposed activities, and has been afforded an opportunity to ask such questions of the Company's agents, accountants and other representatives concerning the Company's proposed business, operations, financial condition, assets, liabilities and other relevant matters as he or it has deemed necessary or desirable, and has been given all such information as has been requested, in order to evaluate the merits and risks of the investment contemplated herein.

9.15. *Estoppel Certificate*. Each Member shall, within ten (10) days after written request by any Member, deliver to the requesting Person a certificate stating, to the Member's knowledge, that: (a) this Agreement is in full force and effect; (b) this Agreement has not been modified except by any instrument or instruments identified in the certificate; and (c) there is no default hereunder by such Member, or if there is a default, the nature or extent thereof.

[Remainder of page intentionally blank]

17

IN WITNESS WHEREOF, the parties have executed, or caused this Agreement to be executed as of the date first above written.

MEMBERS:

_____
EDDIE BATOON

Address:

2471 Mitton Dr. San Jose
CA, 95148
Social Security Number:

2u - 52 - 9uu9


_____
FLORA BATOON

Address:

2971 Mitton Drive
San Jose, CA 95148
Social Security Number:

576 - 92 - 0768


_____
ROBERT DURWARD
1681 Shortridge Avenue
San Jose, CA 95116

Social Security Number:
621 - 69 - 9088


_____
JULIA C. DURWARD
1681 Shortridge Avenue
San Jose, CA 95116

Social Security Number: 529 - 33 - 7864

18

Limited Liability Company
Operating Agreement

Exhibit A
List of Members, Capital, and Percentages

| Name and Taxpayer Identification No. of Members | Initial Capital Contribution | Percentage Interest |
|---|---|---|
| Eddie Batoon | $_____ | 25% |
| Flora Batoon | $_____ | 25% |
| Robert Durward | $_____ | 25 % |
| Julia C. Durward | $_____ | 25 % |

19

## Exhibit B
## Special Tax Allocations and Tax Definitions

4.3.   *Special Allocations and Other Tax Provisions.*

    (a)   *Special Allocations.*

        (1)   No allocation of Profits or Loss under *Section 4.2* will be made unless it would be considered, under the Regulations promulgated under Code Section 704(b) (the "704(b) Regulations"), either to have substantial economic effect, or to be in accordance with the Interest Holders' interests in the Company. To the extent necessary to comply with the foregoing, in lieu of the allocations set forth in *Section 4.2*, the Members may cause the Company's Profits or Losses, or any items thereof, to be reallocated among the Interest Holders in such manner as the Members may determine to be fair, appropriate and consistent with the provisions of the 704(b) Regulations, including, without limitation, the provisions of Regulations Section 1.704-2(f) (minimum gain chargeback), Section 1.704-2(i)(4) (partner nonrecourse debt minimum gain chargeback), and *Section* 1.704-1(b)(2)(ii)(d) (qualified income offset), each of which is incorporated herein by this reference.

        (2)   Special allocations of Profits (or items thereof) will be made to any Interest Holder if the Members determine that such Interest Holder's Capital Account would otherwise have a deficit capital account balance that (in absolute value) exceeds the maximum deficit balance that would be permitted under the 704(b) Regulations.

        (3)   If any allocation of Losses (or any item thereof) would result in a deficit balance in an Interest Holder's Capital Account that would (in absolute value) exceed the maximum deficit balance that would be permitted under the 704(b) Regulations, some or all of such Losses (or items thereof) may be reallocated to any other Interest Holders whose Capital Accounts would not have such excess deficit balances (in proportion to their respective Percentage Interests).

        (4)   The allocation provisions of this Agreement are intended to produce final Capital Account balances of the Interest Holders that will permit liquidating distributions that are made in accordance with such final Capital Account balances under *Section* 4.3(a) to be equal to the distributions that would occur if such liquidating distributions were to be made to the Interest Holders in proportion to their Percentages. To the extent that the tax allocation provisions of this Agreement would not produce such final Capital Account balances, (i) the Members shall amend such provisions if and to the extent necessary to produce such result; and (ii) the Members shall reallocate taxable income or taxable loss of the Company for prior open years (or items of gross income and deduction of the Company) among the Interest Holders to the extent it is not possible to achieve such result with allocations of income (including gross income) and deduction for the current year and future years.

20

(b)    *General.*

(1)    For purposes of reporting each Interest Holder's share of federal, state and any applicable local income taxes, items of income, gain, loss, deduction and credit will be allocated in accordance with the provisions of Code Section 704(c) and the Regulations promulgated thereunder, so as to properly take into account any variation between the adjusted tax basis and the book value of Company assets, using any method that complies with Regulations Section 1.704-3 as the Members determine to be fair and appropriate.

(2)    All amounts required to be withheld pursuant to Code Section 1446 or any other provision of federal, state, or local tax law will be treated as amounts actually distributed to the affected Interest Holders for all purposes of this Agreement. If the Members determine that the Company does not have sufficient funds to satisfy such withholding obligations for an Interest Holder, that Interest Holder shall contribute the funds necessary to satisfy the withholding obligation.

(3)    If any assets of the Company are distributed in kind to the Interest Holders, those assets shall be valued on the basis of their fair market value, and any Interest Holder entitled to any interest in those assets shall receive that interest as a tenant-in-common with all other Interest Holders so entitled. Unless the Members otherwise agree, the fair market value of the assets shall be determined by an independent appraiser who shall be selected by agreement of the Members. The Profit or Loss for each unsold asset shall be determined as if the asset had been sold at its market value, and the Profit or Loss shall be allocated as provided in *Section* 4.1 and shall be properly credited or charged to the Capital Accounts of the Interest Holders prior to the Distribution of the assets in liquidation pursuant to *Section* 4.3(a).

(4)    All Profit and Loss shall be allocated and all distributions shall be made to the Persons shown on the records of the Company to have been Interest Holders as of the last day of the taxable year for which the allocation or Distribution is to be made. Notwithstanding the foregoing, unless the Company's taxable year is separated into segments if there is a Transfer or an Involuntary Withdrawal during the taxable year, the Profit and Loss shall be allocated between the original Interest Holder and the successor on the basis of the number of days each was an Interest Holder during the taxable year; provided, however, the Company's taxable year shall be segregated into two or more segments in order to account for Profit, Loss, or proceeds attributable to any extraordinary non-recurring items of the Company.

(5)    The Interest Holders are aware of the income tax provisions of this Agreement and agree to be bound by these provisions in reporting their share of Profits, Losses, and other items for federal and state income tax purposes.

(c)    *Tax Definitions.* For purposes of this Agreement:

"*Capital Account*" means the account to be maintained by the Company for each Interest Holder in accordance with Regulation Section 1.704-1(b)(2)(iv). If any Economic Interest is transferred pursuant to the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent the Capital Account is attributable to the transferred

21

interest. If the book value of Company property is adjusted pursuant to *Exhibit* B Section 4.3(a), the Capital Account of each Interest Holder shall be adjusted to reflect the aggregate adjustment in the same manner as if the Company had recognized gain or loss equal to the amount of such aggregate adjustment. All provisions of this Agreement relating to the maintenance of Capital Accounts shall be interpreted and applied in a manner consistent with Regulation Section 1-704-1(b)(2)(iv).

"*Code*" means the Internal Revenue Code of 1986, as amended, or any corresponding provision of any succeeding revenue law.

"*Negative Capital Account*" means a Capital Account with a balance of less than zero.

"*Positive Capital Account*" means a Capital Account with a balance greater than zero.

"*Profit*" and "*Loss*" means, for each taxable year of the Company (or other period for which Profit or Loss must be computed), the Company's taxable income or loss determined in accordance with Code Section 703(a), with the following adjustments: (i) all items of income, gain, loss, deduction, or credit required to be stated separately pursuant to Code Section 703(a)(1) shall be included in computing taxable income or loss; (ii) any tax-exempt income of the Company, not otherwise taken into account in computing Profit or Loss, shall be included in computing taxable income or loss; (iii) any expenditures of the Company described in Code Section 705(a)(2)(B) (or treated as such pursuant to Regulation Section 1.704-1(b)(2)(iv)(i)) and not otherwise taken into account in computing Profit or Loss, shall be subtracted from taxable income or loss; (iv) gain or loss resulting from any taxable disposition of Company property shall be computed by reference to the book value as adjusted under Regulation Section 1.704-1(b) ("adjusted book value") of the property disposed of, notwithstanding the fact that the adjusted book value differs from the adjusted basis of the property for federal income tax purposes; (v) in lieu of the depreciation, amortization, or cost recovery deductions allowable in computing taxable income or loss, there shall be taken into account the depreciation computed based upon the adjusted book value of the asset; and (vi) notwithstanding any other provision of this definition, any items which are specially allocated pursuant to Exhibit B Section 4.3(a) shall not be taken into account in computing Profit or Loss.

"*Regulation*" means the income tax regulations, including any temporary regulations, from time to time promulgated under the Code.

22